**In re Tinga Khendeka SEISAY, Gunilla Elizabeth Seisay, Debtors.**

**Bankruptcy No. 84 B 20252.**

United States District Court, S.D. New York.

May 8, 1985.

Thomas J. Romans, P.A., Hackensack, N.J., for debtors.

Miller & Arnow, Levittown, N.Y., for Gary Bernard Inc.

Jeffrey L. Sapir, Yonkers, N.Y., Trustee.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

## DECISION ON OBJECTION TO CLAIM

These Chapter 13 debtors object to the claim filed by Gary Bernard Incorporated, the holder of a secured claim collateralized by a mortgage filed against their principal residence located in New Rochelle, New York. The basis for the debtors' objection is the assertion that the loan was made to them for personal needs at a 24 percent per annum rate of interest, which they contend is usurious, with the result that the entire loan transaction should be declared void pursuant to applicable New York law. The creditor maintains that the loan was made to a corporation owned by the debtors and that a corporation may be organized for the primary purpose of obtaining a loan where the lender refuses to make such a loan to an individual. Hence, the creditor contends that the debtors have failed to prove that the loan in this case was made to them as individuals, rather than to a corporation.

## FINDINGS OF FACT

1. On June 12, 1984, the debtors, Tinga Khendeka Seisay, and his wife, Gunilla Elizabeth Seisay, filed with this court their petition for an adjustment of debts pursuant to Chapter 13 of the Bankruptcy Code.

2. The debtor, Tinga Khendeka Seisay, is the former Counsel General of Sierra Leone, who was stationed at the Sierra Leone Consulate office in New York City from 1968 through 1974. He sought and obtained political asylum in this country after his cousin, who was Chief of Staff of the Army in Sierra Leone, was executed. Mr. Seisay is now employed in this country as a vice president of Liberian Electronics Enterprises, a company that merchandises electronic appliances in Liberia. He majored in engineering at the University of Stockholm and holds a masters degree in political science from Long Island University. He is pursuing a PHD degree at the New School in New York City. The Seisay's have six children and reside in a one family home in New Rochelle, New York.

3. Mrs. Seisay holds a master's degree in Secondary School education and French language. She was recently appointed principal of St. Michael's School in Yonkers, New York, where her starting salary was $13,000 per annum.

4. The major claim in this case was filed by Gary Bernard Incorporated as the holder of a secured claim in the amount of $147,785, with interest at the rate of 24 percent per annum, collateralized by a sec-

ond mortgage against the debtors' residence in New Rochelle, New York. The original principal amount of this loan was $120,000.

5. In June of 1983, Mr. Seisay was experiencing financial difficulties in establishing himself in this country. He was personally indebted to various sources for personal loans previously obtained and was unable to keep current on his home mortgage with Chemical Bank. Accordingly, Mr. Seisay picked up the real estate section of the New York Times to see if he could find a mortgage broker who could obtain a mortgagee to satisfy the Chemical Bank mortgage of approximately $32,000. Mr. Seisay noticed an advertisement by Stuart Leibowitz, a mortgage broker. Mr. Seisay telephoned Mr. Leibowitz and explained his need for approximately $40,000 to pay off the Chemical Bank mortgage and some other personal debts. Mr. Leibowitz said that he would introduce Mr. Seisay to someone who would be able to offer financial help. Shortly thereafter, Mr. Roger Saunders, a principal of the corporate creditor, Gary Bernard Incorporated, telephoned Mr. Seisay and said that Mr. Leibowitz had asked him to call about possible mortgage financing. Following this telephone conversation, Mr. Saunders and his colleague, Mr. Bernard Wesson, another principal of Gary Bernard Incorporated, visited Mr. Seisay at his home and viewed the premises.

6. During their visit to Mr. Seisay's residence, Messrs. Saunders and Wesson informed Mr. & Mrs. Seisay that they would need a corporation for this type of transaction or they could not obtain the loan. Mr. Seisay mentioned that he had formed a corporation in 1968 called Helsingborg Construction Corp. when he was seeking to establish himself in this country, but that the corporation never really existed; it did no business, paid no taxes, issued no stock, and had no assets. Messrs. Saunders and Wesson indicated that they were willing to advance $40,000, with interest at the rate of 24 percent per annum in order to allow Mr. Seisay to pay off the Chemical Bank mortgage and some personal debts.

7. Thereafter, Mr. Seisay received a telephone call from the mortgage broker, Stuart Leibowitz, who said that the Seisays had a substantial equity in their house and that the mortgage loan could be increased to $120,000. Later Mr. Saunders telephoned Mr. Seisay and set up a meeting in Mr. Wesson's home in Queens, New York, where they agreed to a $120,000 mortgage loan.

8. Mr. Seisay later received from Mr. Edward Miller, the attorney for Gary Bernard Incorporated, some forms which were to be filled out in connection with the loan and returned to Mr. Miller.

9. Stuart Leibowitz, the mortgage broker, submitted a contract to Mr. Seisay which called for a broker's commission of 6 percent to be paid at the closing. Prior to the closing, Mr. Leibowitz telephoned Mr. Seisay and said that he had obtained a lawyer for him. Mr. Seisay objected to this suggestion and advised Mr. Leibowitz that he had his own lawyer. However, Mr. Leibowitz insisted that Mr. Jonathan Kohan should act as Mr. Seisay's lawyer. Thereafter, Mr. Jonathan Kohan called Mr. Seisay and said that he was a New York lawyer who practiced law in New York and that Mr. Seisay should have no fear. As a matter of fact, Mr. Kohan testified at the trial that he was not admitted to the Bar of the State of New York. It also appears that Mr. Kohan was Mr. Leibowitz' lawyer and that he was currently representing Mr. Leibowitz in other matters. Mr. Leibowitz had also referred other clients to Mr. Kohan when Mr. Leibowitz acted as a mortgage broker. Mr. Kohan testified that Mr. Leibowitz was a source of referral business in similar transactions. Mr. Seisay first met Mr. Kohan in person at the mortgage closing, which took place in Mr. Miller's office on June 24, 1983.

10. When Mr. Seisay first visited Mr. Miller's office in early June of 1983, and the original figure of $40,000 was increased to $120,000, Mr. Seisay requested that the name of the corporation which Messrs. Saunders and Wesson required as the corporate borrower be changed from Helsing-

borg Construction Corp. to Tagin Consultants, Inc. The latter entity was a corporate shell that was formed in March of 1980 by friends of the Seisays and given to them as a present should they desire to use it. As in the case of Helsingborg Construction Corp., Tagin Consultants, Inc. had no assets, paid no franchise taxes, issued no stock and did no business.

11. Upon the receipt of various forms from Mr. Miller which had to be filled out before the closing, Mr. Seisay called Mr. Leibowitz and said that he was not in a position to fill out an affidavit with respect to Tagin Consultants, Inc. Mr. Seisay's concern related to the lines which called for information about "Type of Business" and "Proposed Use of Corp. Loan Proceeds." Mr. Leibowitz suggested that Mr. Seisay fill in "International Merchants" and "To improve our international market + sales advertisements" as to these respective items.

12. The loan transaction took place on June 24, 1983 in Mr. Miller's office. Gary Bernard Incorporated made the following payments; totalling $120,000:

$1,802—to the title company
$10,400—to Stuart Leibowitz as a broker's commission.
$1,500—to Edward Miller, as attorney for the lender
$1,000—to Jonathan Kohan as attorney for the borrower
$105,198—to Tagin Consultants, Inc.

13. The check for $105,298 to Tagin Consultants, Inc. was kept by Mr. Kohan and not turned over to Mr. Seisay. Mr. Kohan opened up a bank account with Chemical Bank in the name of Tagin Consultants, Inc., with Mr. Kohan listed as the sole signatory. Although Mr. Seisay directed him to satisfy the Chemical Bank mortgage of approximately $32,000, Mr. Kohan did not comply as instructed. Mr. Seisay testified that he was ultimately required to retain another attorney to obtain the balance of the loan proceeds from Mr. Kohan, at a cost of $5000 in legal fees for the second attorney.

14. Mr. Seisay testified that he used the loan proceeds that he later received for his personal needs, including the repayment of a Citibank loan and a trip for his children to Europe to visit their maternal grandparents. He also applied $10,000 towards the purchase of a house in Africa that could be used as a haven for some of his people who were seeking refuge from political persecution.

15. The various documents which were submitted to Mr. Seisay in quick succession at the closing on June 24, 1983 were not read by Mr. Seisay because he relied upon his lawyer Mr. Kohan to review them. Among the papers signed by Mr. Seisay was a letter dated June 6, 1983 from Mr. Miller which contains the following two paragraphs:

Gentlemen:

We have been informed by our client, the lender, that your application for a corporate loan has been approved in accordance with the disclosure statement attached hereto. This commitment is subject to an insurable title.

It is warranted by you, as the corporate borrower to our client, as the lender, that the principal business of the corporation is as set forth on the questionaire affidavit attached hereto and that the monies to be borrowed are to be used solely for corporate purposes. The borrower further warrants that it does not operate as a corporate shell. The net proceeds of this loan *must* be deposited in the corporate bank account and used solely for corporate purposes.

16. The debtors have sustained their burden of establishing that the corporate entity which was employed as the vehicle through which the loan was passed to the individual debtors was not engaged in any business activity; it was a dormant shell with no issued stock and not engaged in any profit-motivated enterprise.

17. They have also established that the loan was in fact made to the debtors to alleviate their dire personal financial stress resulting from the threatened mortgage foreclosure on their home by the Chemical

Bank and from the press of personal debts owed by Mr. Seisay. Although the forms employed by the lender reflect that the loan was made to a corporation for business purposes, the actual facts reveal that the funds were advanced for the personal use of Mr. Seisay and not in furtherance of any corporate or personal business purpose of Tagin Consultants, Inc. The forms do not control when the clear facts negate any business purpose for the loan and show that the funds advanced by Gary Bernard Incorporated were actually used for the personal needs of the debtors, which fact was conveyed to the representatives of Gary Bernard Incorporated by Mr. Seisay when he explained to them his need for financial help.

18. It also appears that the representatives of Gary Bernard Incorporated were well aware that the expected source of funds for repayment of the indebtedness by the Seisays was from their personal resources and not from any profit-motivated enterprise involving Tagin Consultants, Inc.

## DISCUSSION

The debtors maintain that the underlying transaction, which called for repayment of the loan at an interest rate of 24 percent per annum, was usurious and unenforceable under section 5–501 of the New York General Obligations Law.[1] The plaintiff responds that the loan was made not to an individual but to a corporation, which is precluded by section 5–521 of the New York General Obligations Law[2] from interposing the defense of usury, and that an individual guarantor of a corporate obligation is similarly precluded from asserting that defense.

■ The defense of usury is not generally available to a corporation by reason of section 5–521 of the New York General Obligations Law, or to an individual guarantor of a corporate loan. *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 95, 89 N.E.2d 238 (1949); *Buoninfante v. Hoffman*, 48 A.D.2d 678, 367 N.Y.S.2d 984 (2nd Dep't 1975). This rule applies even where a loan is made to a "dummy" corporation as a subterfuge for avoiding what would otherwise have been a usurious loan to an individual in cases where the funds were used for business purposes rather than personal needs, with the result that the individual guarantor is not permitted to avoid such obligation by asserting the defense of usury. *Leader v. Dinkler Management Corp.*, 20 N.Y.2d 393, 399–400, 230 N.E.2d 120, 123, 283 N.Y.S.2d 281, 285 (1967); *Hoffman v. Lee Nashem Motors, Inc.*, 20 N.Y.2d 513, 516, 231 N.E.2d 765, 766, 285 N.Y.S.2d 68, 69 (1967); *Jenkins v. Moyse*, 254 N.Y. 319, 323–24, 172 N.E. 521 (1930); *Dart Associates v. Ste-Con Corp.*, 66 A.D.2d 973, 412 N.Y.S.2d 55 (3rd Dep't 1978). The judicial reluctance to allow the defense of usury in such case was explained by the New York Court of Appeals

1. § 5–501. Rate of Interest; Usury forbidden
   1. The rate of interest, as computed pursuant to this title, upon the loan or forbearance of any money, goods, or things in action, except as provided in subdivisions five and six of this section or as otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law.
   2. No person or corporation shall, directly or indirectly, charge, take or receive any money, goods or things in action as interest on the loan or forbearance of any money, goods or things in action at a rate exceeding the rate above prescribed. The amount charged, taken or received as interest shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance as defined by the banking board pursuant to subdivision three of section fourteen-a of the banking law except such fee as may be fixed by the commissioner of taxation and finance as the cost of servicing loans made by the property and liability insurance security fund.
   N.Y.Gen.Oblig.Law § 5–501 (McKinney Supp. 1984–1985).

2. § 5–521. Corporations prohibited from interposing defense of usury
   1. No corporation shall hereafter interpose the defense of usury in any action. The term corporation, as used in this section, shall be construed to include all associations, and joint-stock companies having any of the powers and privileges of corporations not possessed by individuals or partnerships.
   N.Y.Gen.Oblig.Law § 5–521 (McKinney 1978).

in *Leader v. Dinkler Management Corp.*, 20 N.Y.2d at 400, 230 N.E.2d at 123, 283 N.Y.S.2d at 285–86 as follows:

> The real basis of these decisions has not been judicial blindness to reality but rather a response to it—a response which has in fact been impliedly sanctioned by the Legislature. Almost all of the cases in which we have sustained these loan agreements against charges of usury are cases in which the loans, though made to "dummy" corporations, were being *used to further business ventures of the individuals* who ultimately benefited from the transactions. Moreover, they involved circumstances, such as those present in our case, where it was, for some reason, inconvenient to merge the business venture with the corporation to whom the loan was made. Though in form the business venture and the "dummy" corporations were separate, in fact they were both part of the same enterprise, and the situation was similar to those in which a loan was made to a corporation actually transacting business. The results reached clearly conformed to the legislative policy of refusing to permit corporations—even though they be close corporations—to avoid obligations on which they had become bound.

(emphasis added) (footnote omitted).

However, where no business purpose is involved and the principal motive for the use of a "dummy" or dormant corporation is to serve as a paper conduit for the transmission of funds from a lender to an individual borrower to pay personal obligations rather than for business purposes, the courts have been more circumspect in sanctioning the practice of passing funds through an inactive corporation to the ultimate individual user. The courts have not permitted form to be elevated over substance and have struck down artificial attempts to evade the usury laws, as explained by the New York Court of Appeals in *Schneider v. Phelps*, 41 N.Y.2d 238, 242–43, 359 N.E.2d 1361, 1365, 391 N.Y. S.2d 568, 571–72 (1977) as follows:

> Through this practice, the lenders could demand usurious rates of interest from desperate and unsophisticated borrowers cloaked with a corporate veil. If form were to control, the creation of a corporation would, for all practical purposes, result in a waiver of the right to assert the usury defense. The salutory commercial purpose of the corporation exemption would be a shield for the loan shark.

It should be stated, however, that there is no difficulty in sanctioning the use of a shell corporation to avoid the usury laws provided that the true borrower *has a business purpose* and the corporation itself is a financing device in furtherance of the *profit-oriented enterprise.* Indeed, many subsequently thriving commercial enterprises start out with a bare corporate cupboard. The basic foundation of our economy rests on the system of free enterprise, and persons seeking to obtain financing, frequently by resort to paper corporate intermediaries, for business enterprises should expect to pay the market rate for the investment capital that they require. On the other hand, lenders are entitled, if they can, without sham transactions, to obtain the highest rate of interest for their money. (*Cf. Jenkins v. Moyse*, 254 NY 319, 323 [172 N.E. 521 (1930)] *supra.*) So long as the borrower is aware of the potential risk and acts in the belief that the ultimate profit justifies the risk undertaken, the free market in money operates without friction and there is no need for legislative or judicial interference. If the venture falls through or if the profits do not reach anticipated levels, the businessman will not be relieved from the consequences of his bad bargain, just as the courts will not relieve a promisor from the obligations of an improvident contract.

The difficulty arises when a corporation is organized, not in furtherance of any corporate or personal enterprise, but to strip from an impoverished debtor the benefits of the usury laws. The purpose of usury laws, from time immemorial, has been to protect desperately poor people from the consequences of their own

desperation. Law-making authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money, have none. In recognizing this problem, the courts have drawn a delicate balance by both enforcing legitimate business obligations and by protecting impoverished debtors from improvident transactions drawn by lenders and brought on by dire personal financial stress.

(emphasis added).

The debtors in this case are well-educated people who do not appear to be as knowledgeable about financial transactions as the situation required. On the other hand, Messrs. Bernard Wesson and Roger Saunders of Gary Bernard Incorporated are thoroughly sophisticated lenders who are well-informed as to the usury laws and the use of inactive corporations through which to pass funds to individual borrowers, as evidenced by the adverse decision in *Bernard Wesson Inc. v. Cullen*, 47 A.D.2d 718, 366 N.Y.S.2d 858 (2d Dep't 1975). In that case, the court held that where the loan in actuality was made to the individual guarantor and where the parties to the loan intended the proceeds to be used by the individual guarantor to discharge his personal obligations, rather than in furtherance of a corporate enterprise, and where the proceeds were in fact used for personal purposes, the defense of usury may be sustained. *Accord North Broadway Funding Corp. v. Freed*, 45 A.D.2d 759, 357 N.Y.S.2d 27 (2nd Dep't 1974); *Sachs v. Real Estate Capital Corp.*, 31 A.D.2d 916, 298 N.Y.S.2d 456 (1st Dep't 1969); *Shapiro v. Weissman*, 7 A.D.2d 752, 181 N.Y.S.2d 43 (2nd Dep't 1958); *Brint v. Ellin Express Corp.*, 51 Misc.2d 796, 273 N.Y.S.2d 860 (Sup.Ct.1966), *aff'd*, 28 A.D.2d 825, 282 N.Y.S.2d 450 (2nd Dep't 1967).

Having found that the lender, Gary Bernard Incorporated, made the loan in question to the individual guarantor, Mr. Seisay, for his personal purposes, and that Tagin Consultants, Inc., the named corporate borrower, served as a paper conduit for the pass through of funds from Gary Bernard Incorporated to Mr. Seisay, it follows that the debtors are not prohibited from asserting the defense of usury. Hence, the loan in question, which was made to the individual guarantor, with interest extracted at the rate of 24 percent per annum, is usurious and void under section 5–501 of the New York General Obligations Law.

### CONCLUSIONS OF LAW

1. The debtors have established that the loan from Gary Bernard Incorporated was in fact, although not in form, made to the individual guarantor, Tinga K. Seisay for his personal purposes, at an interest rate of 24% percent per annum, in violation of section 5–501 of the New York General Obligations Law.

2. The loan in question is usurious and void under section 5–501 of the New York General Obligations Law.

3. The debtors' objection to the claim filed by Gary Bernard Incorporated in the amount of $147,785 is sustained, with the result that the claim shall be expunged.

SUBMIT ORDER on notice.